HAMILTON BANK, N.A., Plaintiff,

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY and John D. Hawke, Jr., Comptroller of the Currency, Defendants

No. CIV.A. 01–742(CKK).

United States District Court, District of Columbia.

Oct. 13, 2001.

E. Lawrence Barcella, Jr., Paul, Hastings, Janofsky & Walker, LLP, Washington, DC, for Plaintiff.

Larry Stein, Office of the Comptroller of the Currency, Washington, DC, for Defendants.

## MEMORANDUM OPINION [1]

KOLLAR–KOTELLY, District Judge.

Plaintiff Hamilton Bank, N.A. ("Hamilton") petitions this Court for a temporary restraining .order and/or preliminary injunction ("TRO/PI") as relief from the March 28, 2001, action of the Office of the Comptroller of the Currency. On March 28, 2001, the Office of the Comptroller of the Currency ("OCC") issued a temporary cease and desist order requiring Hamilton to comply with certain regulations and prerequisites in conjunction with its banking practices. Hamilton asserts that issuance of this temporary order is arbitrary and capricious and is not in accordance with law. After reviewing the submissions of both parties and the administrative record in this case,[2] and considering the argu-

---

**1.** The Court notes at the outset that all of the filings in this case were sealed pursuant to an order by Judge Ellen S. Huvelle dated April 5, 2001. Plaintiff presented the motion to seal on an ex parte basis. Defendant has since indicated that it intends to file a motion to lift the seal as it applies to the majority of the materials filed in this case. Plaintiff has indicated its intent to oppose such a motion, in part. As the matter of the seal has not yet been resolved, the Court will issue this Memorandum Opinion and the accompanying Order under seal, until such time as the seal is lifted in part and this Opinion can be redacted of any information which will remain under seal.

**2.** The Court notes that the formal administrative record was filed by the OCC on April 9, 2001. The materials included therein have

ments presented at the April 10, 2001, hearing, the Court concludes that emergency relief in the form of a TRO or PI is not warranted at this time.

## I. BACKGROUND

### A. Factual Background

Plaintiff Hamilton Bank is a Miami, Florida-based national bank which focuses largely on "global trade finance." Compl. ¶ 9. The OCC, a bureau of the United States Department of Treasury, regulates national banks. As part of this regulation, the OCC conducts periodic examinations, during which OCC examiners review a particular bank's books and records, audit selected transactions, and evaluate the bank's systems and management. *Id.* ¶ 16. Following these examinations, the OCC issues a written report of examination ("ROE") rating the bank in certain categories and rendering written conclusions about the status of the bank's practices. *Id.* ¶ 16.

When potential violations of law or regulation are identified by the OCC, the OCC is authorized in some cases to initiate administrative proceedings, including a "cease and desist proceeding" pursuant to 12 U.S.C. § 1818(b). Pursuant to Section 1818(b), the OCC initiates a cease and desist proceeding by serving a "notice of charges" listing the practices or deficiencies giving rise to the action. 12 U.S.C. § 1818(b). The OCC is required to conduct an administrative hearing no sooner than thirty days and no later than sixty days after the issuance of the notice of charges. *Id.* at § 1818(b).

In the ROE of Hamilton dated August 23, 1999, the OCC identified certain areas of concern with regard to Hamilton's banking practices. Pursuant to those concerns,

the OCC initiated a temporary cease and desist proceeding against Hamilton on February 23, 2000. Compl. ¶ 21. On September 8, 2000, the OCC and Hamilton's board of directors entered into a permanent cease and desist order by consent ("Consent Order") which purported to resolve the deficiencies which caused initiation of the cease and desist proceedings. *Id.* ¶ 21.

On August 28, 2000, the OCC commenced a new examination of Hamilton. This examination resulted in an ROE, which was delivered to the bank on February 13, 2001. *Id.* ¶ 22. OCC again identified certain areas of concern. *Id.* Shortly thereafter, the OCC notified Hamilton that it would like to meet with Hamilton's board of directors to discuss the findings of the most recent ROE. *Id.* ¶ 24. The meeting was held on March 28, 2001, at which time the OCC presented "proposed amendments" to the September 8, 2000, Consent Order which would have imposed additional obligations and restrictions upon the bank. *Id.* ¶ 25. Hamilton's directors declined to agree to the amendments. The OCC then presented the board of directors with the Notice of Charges, pursuant to 12 U.S.C. § 1818(b), and a temporary cease and desist order, as authorized by 12 U.S.C. § 1818(c). *Id.* ¶ 26. Hamilton seeks relief in these proceedings from the requirements and obligations set forth in this Temporary Cease and Desist Order.

### B. Statutory Background

In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), in part, "to improve the supervision of savings institutions by strengthening capital, accounting and other supervisory standards." Pub.L.

---

been certified as the materials which were "presented to the agency decision-maker pri-

or to the issuance of the Temporary Cease and Desist Order." Def. Notice of Filing at 1.

No. 101–73, 103 Stat. 183 (1989); *Ridder v. Office of Thrift Supervision,* 146 F.3d 1035, 1036 (D.C.Cir.1998). Under this statutory regime, the OCC may initiate administrative proceedings once it determines that "any insured depository institution . . . or any institution-affiliated party is engaged or has engaged . . . in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated . . . a law, rule, or regulation, or any condition imposed . . . by the agency." 12 U.S.C. § 1818(b)(1). If any such violation or practice is found to exist "in the opinion of" the OCC, the OCC may "issue and serve upon . . . such party a notice of charges constituting the alleged violation." *Id.* § 1818(b)(1). After the notice and a hearing, the OCC will determine whether a permanent order to cease and desist and/or take affirmative action should be issued against the institution. *Id.* § 1818(b)(1), (6).

In addition to its permanent cease and desist authority, the OCC is statutorily authorized to "issue a temporary order requiring the depository institution or parties to cease and desist from any violation or practice [charged in a Section 1818(b)(1) proceeding]." 12 U.S.C. § 1818(c)(1). The OCC may issue such an order if it determines that the violation or threatened violation or the unsafe or unsound practice or the continuation thereof, specified in the notice of charges, "is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the [administrative] proceedings." *Id.* § 1818(c)(1). A temporary cease and desist order may also be issued where the OCC determines that the bank's "books and records are so incomplete or inaccurate that the appropriate Federal

banking agency is unable, through normal supervisory process, to determine the financial condition of that depository institution." *Id.* § 1818(c)(3). The order may require the party to cease and desist from certain activities and may also require that affirmative action be taken to correct conditions resulting from violations of regulations or written agreements. *Id.* § 1818(c). Such affirmative acts may include (1) making restitution or providing reimbursement, indemnification, or guarantee against loss; (2) disposing of any loan or asset involved; and/or (3) taking such other action as the banking agency determines to be appropriate. *Id.* § 1818(b)(6) and (c)(1); *Parker v. Ryan,* 760 F.Supp. 1189, 1191 (N.D.Miss.1991).

Within the same statutory scheme, Congress has severely limited the jurisdiction of courts to review ongoing administrative proceedings brought by banking agencies. *See CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 741 (D.C.Cir.1995). This limitation is evidenced by Section 1818(i)(1) which provides that, "except as otherwise provided in this section . . . no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under [this] section, or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. § 1818(i)(1). Temporary cease and desist orders, however, are reviewable. *See CityFed,* 58 F.3d at 742. Section 1818(c)(2) allows subjects of temporary cease and desist orders issued pursuant to Section 1818(c)(1) to apply, within ten days, to their home federal judicial district or to the United States District Court for the District of Columbia "for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings . . . and such

court shall have jurisdiction to issue such injunction." 12 U.S.C. § 1818(c)(2). It is under this provision that Hamilton, having been served with the Temporary Cease and Desist Order on March 28, 2001, initiates this litigation.

*C. Notice of Charges and Temporary Cease and Desist Order*

The Notice of Charges which provides the purported justification for the Temporary Cease and Desist Order is a lengthy document, listing specific charges over forty pages. Accordingly, the Court will attempt to give an overview and summary of the charges to the extent necessary for purposes of this Opinion. The Notice of Charges commences with a regurgitation of the statutory and regulatory language set forth in 12 U.S.C. § 1818(c) and 12 C.F.R. § 308.131 which govern the issuance of temporary cease and desist orders. *See* Notice of Charges ("NOC") at 1–2. Specifically, the NOC alleges violations of 12 U.S.C. § 84 and 12 C.F.R. § 32. These sections regulate the total amount in loans and extensions of credit to a person by a national banking association which may be outstanding at one time and not fully secured. 12 U.S.C. § 84; 12 C.F.R. § 32. The NOC alleges that Hamilton "caused, brought about, participated in, counseled, or aided or abetted these violations" by making loans "directly and indirectly" to Financiera Prestomatic, S.A., Panama ("Prestomatic"). NOC at 3. The NOC also charges Hamilton with failing to file accurate "Call Reports" for the second quarter of 1999, *see* ROD at 5, the second quarter of 2000, *see* ROD at 7, and the first quarter of 2000, *see* ROD at 9, as required by 12 U.S.C. § 161.

The NOC further details alleged failures to file "Suspicious Activity Reports" as mandated by 12 C.F.R. § 21.11. NOC at 11. The suspicious activity alleged in con-

junction with this failure includes the Bank's receipt, during the late summer and fall of 2000, of numerous pouches containing tens of thousands of dollars in personal money orders, with each pouch containing money orders addressed to the same individual, sequentially numbered, and in denominations of $7,500 each. NOC at 11–17. Likewise, the NOC contends that the Bank failed to comply with numerous provisions of the Bank Secrecy Act, 31 U.S.C. §§ 5311–5324. *Id.* at 18.

Article III of the NOC posits that Hamilton engaged in "unsafe and unsound practices" by loaning substantial amounts of money to Pacific Forest Products, Inc., Intek Jamaica, and Intek Steel. *Id.* at 19–21. The same is alleged with regard to Hamilton's dealings with Metrobank International, Vanuatu, Pysca Panama, Prestomatic, Metrobank Panama, and numerous other business entities. *Id.* at 22–35. Generally, these allegations of "unsafe and unsound practices" include improper credit analysis, failure to require collateral or a guaranty, insufficient documentation for the loan, failure to obtain all of the necessary financial information prior to issuing the loan, approving continuous overdrafts, extending additional loans to pay off pre-existing past-due loans, etc. *See id.* In addition, Article III sets forth allegations that Hamilton processed numerous checks drawn on foreign correspondent bank accounts without exercising the appropriate due diligence and without establishing the appropriate "payable through" account procedures. *Id.* at 35. The NOC also alleges that Hamilton operated with insufficient core earnings to support asset growth, loan losses, and dividends. *Id.*

Article IV of the NOC asserts that Hamilton violated numerous provisions of the September 8, 2000, Consent Order by approving overdrafts to Alexander H. Finance Co. and making a two million-dollar

loan to Prestomatic to cover the overdraft. *Id.* at 36.

The OCC, having determined that the circumstances were appropriate for the issuance of a temporary cease and desist order, issued such an order simultaneously with the NOC. Again, the Court will provide a brief summary and overview of the requirements of the Temporary Cease and Desist Order. Article I of the Order sets forth requirements which must be fulfilled on the occasion that Hamilton seeks to extend a loan exceeding one million dollars. Temporary Cease and Desist Order (C & D) at 2. The requirements primarily provide that at least two dozen specific written pieces of information must be included in the loan presentation package. *Id.* at 2–5. Article II bars the bank from permitting overdrafts in excess of $10,000 without compliance with the procedures established for loans in Article I. *Id.* at 6. Article III mandates that the bank must not "place any funds on deposit with any financial institution unless the Bank has documented proof that each such financial institution in licensed to operate as a bona fide financial institution in the jurisdiction in which it is located and actually engages in banking activities in such jurisdiction." *Id.* Article III also provides that Hamilton must comply with the requirements of Article I before placing any funds on deposit with an overseas institution. *Id.*

Article IV of the Temporary Cease and Desist Order consists of what Plaintiff's term a "blacklist," which enumerates over two dozen individuals and corporations with which Hamilton is barred from conducting future business. *Id.* at 7–8. Article V establishes a detailed written program of policies and procedures intended to ensure compliance with the Bank Secrecy Act. *Id.* at 9–12. In Article VI, the OCC places strict regulations on the receipt of "pouches" by Hamilton, requiring the bank to monitor carefully the receipt of such pouches and to examine the contents for potential suspicious activity. *Id.* at 12–15. Under Article VII, the OCC requires Hamilton's Board of Directors, or a designated committee, to review the activity of "each of the Bank's existing foreign correspondent accounts." *Id.* at 15–19. Article VIII directs the Board of Directors to "immediately develop, implement, and thereafter ensure Bank adherence to a written program to establish a system of internal controls and processes to ensure compliance with the requirements to file Suspicious Activity Reports set forth in 12 C.F.R. § 21.11." *Id.* at 19. Article IX prohibits Hamilton from employing consultants and advisors from outside the United States, unless such advisor meets the various conditions provided in the Order. *Id.* at 20–21.

Finally, Articles X and XI address requests for extensions of time and other compliance issues. *Id.* at 22–23. More specifically, Article X provides that if Hamilton requires additional time to comply, it may submit a request to the OCC for relief which explains the need for the extension. *Id.* at 22. Article XI notes that the Temporary Cease and Desist Order is effective upon service, pursuant to 12 U.S.C. § 1818(c)(2) and shall stay in effect unless stayed, modified, or terminated by court order. *Id.* Despite this effect, Article XI provides that if Hamilton views any of the terms of the Temporary Order as causing "undue hardship," the bank may apply for relief from those provisions. *Id.* Seemingly pursuant to Article XI, on March 30, 2001, Hamilton sent a letter to the OCC enumerating eleven items in the Temporary Cease and Desist which the bank viewed as "commercially unreasonable," and "expos[ing] the [b]ank to undue risk and ... unreasonable burden." Pl. Mem., Ex. 8. The OCC responded on April 2, 2001, addressing each of the eleven enu-

merated concerns, offering in certain situations to consider exceptions to the requirements of the Order on a case by case basis, and providing clarification of certain terms pursuant to Hamilton's requests.[3] Pl. Mem, Ex. 9. Since this initial exchange, the OCC and Hamilton have continued to exchange information regarding the terms of the Temporary Cease and Desist Order and the proper application thereof.[4]

## II. DISCUSSION

■ For Hamilton to obtain the temporary injunctive relief that it seeks, it must establish (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *See CityFed*, 58 F.3d at 746; *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). No single factor is dispositive; rather, the Court "must balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed*, 58 F.3d at

747. This calculus reflects a sliding-scale approach in which an injunction may issue if the arguments for one factor are particularly strong "even if the arguments in other areas are rather weak." *Id.* Thus, this Circuit has held that "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.*

### A. Substantial Likelihood on the Merits

Plaintiff challenges the validity of the Temporary Cease and Desist Order on multiple grounds, alleging primarily that certain of the provisions in the Order are so broad and/or vague that they are unsupported by the underlying Notice of Charges and that the terms of the Order are unnecessarily burdensome to the bank. Pl. Mem. at 15. In addition, Hamilton repeatedly insists, in somewhat general terms, that there are procedural defects attendant to the OCC's issuance of the Temporary Cease and Desist Order. Hamilton's assertions in this regard posit that there was no "emergency" justifying the issuance of the Temporary Cease and

3. For example, the letter dated April 2, 2001, from the OCC to the bank, clarifies that Article IV's prohibitions do not apply to the "government of Panama." Pl. Mem. Ex. 9 at 4. Rather, the prohibitions in Article IV apply only to the Miami Office of the Consulado de Panama and to transactions with that office that are related to Manuel Cohen and are not authorized by the Republic of Panama. *Id.*, Ex. 9 at 4. The letter further indicates that the Bank is not precluded by Article IV from receiving wire transfers in connection with the repayment of loans in accordance with the original terms of the loan. *Id.*, Ex. 9 at 4. Lastly, the April 2 letter specifies that the Bank need only comply with the terms of Article IV "to the extent that the Bank knows or has reason to believe that a party is providing funds to any entity listed in paragraphs (1)(a)-(f)." *Id.*, Ex. 9 at 4.

4. Specifically, at the hearing held on April 10, 2001, the OCC indicated that it had clarified, via letter, that the terms of Articles I and II of the Temporary Cease and Desist Order are intended to apply only to new loans and lines of credit and not to already existing loans and credit lines, even if the full amount of the loan or credit line has yet to be extended. The OCC also indicated that the prohibition on transactions with entities and individuals on the so-called "black-list" would apply only to new transactions. The OCC assured the Court and Hamilton that the terms of the Temporary Cease and Desist Order were not intended to alter or interfere with existing contractual agreements, but that the terms are intended to apply to future agreements.

Desist Order prior to a full administrative hearing. Likewise, Hamilton contends that the OCC acted prematurely when it neglected to consider the bank's March 28, 2001, oral presentation and documentation thereof prior to issuing its Notice of Charges and the Temporary Cease and Desist Order. *Id.* at 4.

In response to these assertions, the OCC maintains that its actions were justified by the circumstances and were fully within its statutory authority. The OCC frames its analysis of the likelihood of success on the merits as an examination of whether the agency can establish a prima facie case in support of the charges underlying the Order. If the agency can establish this prima facie case, argues the OCC, then the Temporary Cease and Desist Order is legitimate under the statute and should not be enjoined. Def. Opp. at 2.

A number of courts have adopted the prima facie framework as a useful tool of analysis for determining whether the agency has acted appropriately in issuing a temporary cease and desist order. *See Parker v. Ryan,* 959 F.2d 579, 583 (5th Cir.1992); *Boberski v. Ryan,* 793 F.Supp. 170, 172 (N.D.Ill.1992); *Wheeler v. Office of the Comptroller of the Currency,* 1998 872945 (N.D.Tex.1998). In these cases, the courts have held that a prima facie case requires "a verified statement of the specific facts giving rise to the violations or improprieties." *Parker,* 959 F.2d at 583; *Wheeler,* 1998 WL 872945 at *5. Although the D.C. Circuit has not, to date, framed review of agency issuance of a Section 1818(c) temporary cease and desist order in terms of a prima facie case, this characterization comports with the Court of Appeals' approach in *CityFed,* wherein the court warned that its jurisdiction did not extend to the underlying cease and desist proceeding, *CityFed,* 58 F.3d at 743, and examined instead the "reasonable be-

lief" of the agency upon issuing the temporary cease and desist order in that case, *id.* at 746.

■ The statutory scheme which permits the OCC to issue temporary cease and desist orders prior to a full administrative proceeding, as described above, is clear. Consequently, as emphasized by the Court of Appeals in *CityFed,* this Court's jurisdiction to review the issuance of such an order is highly circumscribed. *Id.* at 743. Although the merits of the underlying permanent cease and desist proceeding are somewhat intertwined with the legitimacy of the temporary cease and desist order, *CityFed Financial Corp. v. Office of Thrift Supervision,* 919 F.Supp. 1, 3 n. 1 (D.D.C.1998), *aff'd.* 58 F.3d 738 (D.C.Cir.1995), the Court must be mindful that its review of the OCC's action does not encompass a review of the power of the OCC to require affirmative action as a result of the underlying proceeding, nor does it extend to any independent consideration of the merits of the underlying proceeding. *CityFed,* 58 F.3d at 743. Thus, the "object of judicial review [of a temporary cease and desist order] is to ensure that a factual and statutory basis exists for the agency's action and that the temporary order comports with the scope of the OTS's powers." *Parker v. Ryan,* 959 F.2d 579, 583 (5th Cir.1992).

■ In support of its prima facie case, the OCC notes first that its simultaneous issuance of the Notice of Charges and the Temporary Cease and Desist Order is procedurally appropriate and was not contrary to the statutory scheme. The Court cannot disagree. As a threshold matter, the Court can find no requirement, nor does Plaintiff point to any, which indicates that a Notice of Charges cannot be issued simultaneously with a temporary cease and desist order. Indeed, the OCC accurately points out that Section 1818(c)(3), of Title

12, appears to have only one prerequisite, namely, that the "violation or threatened violation or the unsafe or unsound practice or practices" which justify the issuance of a temporary cease and desist order, are "specified in the notice of charges served upon the depository institution." 12 U.S.C. § 1818(c)(3). Apart from certain information related to the administrative proceeding, the notice of charges itself need only provide "a statement of facts constituting the alleged violation or violations or the unsafe or unsound practice or practices." *Id.* § 1818(b)(1). Plaintiff challenges the sufficiency of the content of the Notice of Charges[5] inasmuch as it complies with the statutory requirement of a "statement of facts constituting the alleged violation or violations or the unsafe or unsound practice or practices." *Id.* § 1818(b)(1). The Court finds little basis for such a challenge in light of the detailed allegations in the NOC and the fact that the Temporary Cease and Desist Order appears to track the terms of the NOC quite closely. Finding no deficiency in the NOC itself, and no additional prerequisite to the issuance of a temporary cease and desist order, there is little doubt that, at least procedurally, there is no basis for enjoining the OCC's Order.

Plaintiff's first enumeration of substantive defect alleges that the OCC's issuance of the Temporary Cease and Desist Order is premature and that there is no "emergency" justifying the issuance of the Order. In conjunction with this assertion, Hamilton argues that the OCC erred by failing to consider Plaintiff's presentation to the OCC on March 28, 2001, prior to the issuance of the Temporary Cease and Desist Order. The Court finds little merit in these assertions.[6]

■ The statutory scheme does not require the OCC to attempt to negotiate any sort of consent or settlement with the institution prior to issuing a temporary cease and desist order, nor does it require the OCC to listen to the excuses and arguments of the institution charged with the violation.[7] *See generally,* 12 U.S.C. § 1818. Quite to the contrary, the issuance of a temporary cease and desist order, as even Hamilton characterizes it, is an emergency measure, which is to be used without pause or delay for presentations or negotiations where the "appropriate Federal banking agency," here the OCC, determines that the allegedly unsafe

---

5. Although Plaintiff clearly disputes the accuracy of the charges contained therein, such a challenge is not properly before this Court and must be reserved for the merits of the underlying proceeding.

6. In conjunction with its March 28, 2001, oral presentation, Hamilton provided the OCC with a written summary of the presentation. This summary has not been included in the formal administrative record because it was not presented to the decision-maker prior to the issuance of the "Decision on Issuance of Temporary Order to Cease and Desist." Likewise a few days prior to the March 28, 2001, oral presentation, the bank sent two letters, via overnight mail, to the OCC responding to the allegations contained in the ROD. *See* Pl. Reply, Ex. 1 (letters dated March 23, 2001,

and March 26, 2001). These two letters were not presented to the decision-maker at the OCC, and therefore, are not considered part of the formal administrative record.

7. The Court notes in this regard that the issuance of the March 28, 2001 Order marks the second time the OCC has been "unable to determine, with any degree of certainty, the true financial condition of [Hamilton]." Def. Opp. at 6. Given this, continuing, and seemingly compounded inability, there exists ample justification for an increased sense of urgency based upon the OCC's alleged inability to ensure correction of the incomplete books and records, and more significant inability to fully ascertain the degree to which the bank's assets, are subject to insolvency, dissipation, and other prejudice.

or unsound banking practices are likely to cause harm to the financial condition of the bank. The OCC made such a determination, and so long as that determination is properly supported, the bank's challenge to the issuance of the Temporary Cease and Desist Order must fail.[8]

Plaintiff's real problem with regard to the determination that immediate action, rather than further negotiation was appropriate, likely stems not from a procedural defect, but from a basic disagreement with the statutory scheme. Of course, it is not the role of the Court to consider the merits of the statute itself. Rather, the Court need only determine if there has been procedural compliance with the statute, and in this case, it appears that there has been such compliance.

 As mentioned above, the determination for whether the conditions are appropriate for immediate action in the form of a temporary cease and desist order, is dedicated entirely to the discretion of the "appropriate Federal banking agency." As a result, to survive a challenge to

the issuance of a temporary cease and desist order, the agency need only set forth a prima facie case showing that the order was appropriate. In the instant case, the OCC has determined that not merely one, but both of the independent statutory grounds justifying the issuance of a temporary cease and desist order have been satisfied in Hamilton's case. That is, the OCC alleges that the bank is engaged in unsafe and unsound practices which threaten the bank's stability *and* that the bank's books and records are so incomplete and inaccurate that the OCC cannot discern the true nature of the bank's financial condition. 12 U.S.C. § 1818(c)(1) and (3). This determination and the underlying allegations are well supported by the ROE, the underlying affidavits, and the "Decision on Issuance of Temporary Order to Cease and Desist" ("Decision").[9] These documents allege in detail a pattern and practice of violations of law, unsafe and unsound banking practices, incomplete, inaccurate, misleading or nonexistent books and record, and violations of the 2000 Consent Order.[10] The Decision explains the

---

8. The bank argues that if the OCC had considered the information provided in its March 28, 2001 proposal, it would have concluded that the circumstances were not appropriate for the immediate issuance of a temporary cease and desist order. The Court cannot agree. Much of the presentation by Hamilton on March 28 consisted of promises and plans, however detailed, by the bank to remedy some of the problems noted by the OCC examiners. As the OCC explains, the Bank's promises are unenforceable, and in the face of the significant problems alleged to exist at Hamilton, some of which the bank acknowledges, the OCC would be remiss to simply accept the bank's promises without some further verification. Def. Surreply at 4. More importantly, as the OCC aptly points out, "[a] bank's promises to reform, regardless of how reliable they might be, do not detract from a banking agency's authority to order the bank to take affirmative action under a temporary order." *Id.* The bank's arguments in this regard fail to recognize that the OCC is pro-

vided with the power to issue temporary cease and desist orders in order to ensure that the status of an institution is effectively frozen in time. This freezing ensures that no further threat will accrue while remedial measures are introduced. The bank's proposal does not provide for any such freezing mechanism. Accordingly, it is inadequate to perform the required task.

9. The Decision on Issuance of Temporary Order to Cease and Desist is an agency document which was not provided to Hamilton during the decision-making process, but was only provided during the course of this litigation. *See* Pl. Reply at 2 n. 1.

10. Per the government's summary, the 2000 Consent Order addressed the following: deficiencies in capital level, asset quality, management and earnings, unsafe and unsound credit practices, inaccurate and incomplete books and records, inaccurate regulatory re-

manner in which each of these conditions poses a severe threat to the condition of the bank. As verified by the underlying affidavits, these documents from the administrative record clearly satisfy the prima facie case requirement for the allegation of unsafe and unsound practices, and well as the allegation of incomplete and inaccurate books and records. Accordingly, it appears from the OCC's presentation of a prima facie case supporting the issuance a temporary cease and desist order that there is little justification, in terms of Plaintiff's likelihood of success on the merits, for the Court to intervene at this juncture.

Plaintiff's strongest point of argument with regard to the merits is likely that the Temporary Cease and Desist Order, as issued, is vague in its terms, and consequently, is overly broad. This assertion is evidenced by the already numerous clarifications or narrowing interpretations Hamilton has obtained from the OCC upon inquiry. *See e.g.*, Pl. Mem., Ex. 9; Def. Surreply, Ex. 2. The OCC responds that, despite this apparent need for clarification, the Temporary Cease and Desist Order is very specific and any existing ambiguity could not reasonably have been avoided. Nonetheless, the bank insists that the vague nature of the Order renders it unlawful.

The Temporary Cease and Desist Order issued by the OCC is a lengthy and thoroughly detailed document. In the Court's view, to require further detail threatens to hinder the OCC's ability to act in situations which require immediate attention. There is little doubt that OCC is unable to anticipate every potential interpretation or permutation of facts related to the Temporary Cease and Desist Order which might arise during the course of business. Recognizing this fact, the OCC directs Hamilton's and the Court's attention to Article XI of the Order, which provides a means by which uncertainty and ambiguity can be resolved. *See* C & D at 22–23. The OCC has already proven that Article XI can be an effective mechanism for clarifying or narrowing the terms of the document as necessary. *See e.g.*, Pl. Mem., Exs. 8 & 9; Def. Surreply, Ex. 2. Accordingly, the Court cannot say that the Temporary Cease and Desist Order is unenforceable based solely upon the fact that some of its terms may be subject to multiple interpretations.[11] In light of the foregoing, it appears that the OCC is substantially likely to succeed on the merits.

### B. Irreparable Harm

The law with regard to injury is unequivocalthe moving party must make a showing of irreparable injury in order to justify

ports on the bank's financial condition, and "violation of a number of laws." Def Opp. at 3–4. The government then summarizes the concerns of the Temporary Cease and Desist Order, issued March 28, 2000, as threefold: (1) unsafe and unsound practices in originating loans; (2) failure to maintain complete and accurate books and records; and (3) failure to report suspicious activities, specifically pouch activity, but there is other activity as well. *Id.* at 4–5. It appears that the first and third of these concerns are primarily independent from the concerns raised in the 2000 Consent Order. Along these same lines, therefore, it appears that the second concern, addressing the accuracy of the bank's books

and records is one which was addressed by the 2000 Consent Order, but remains a primary concern addressed by the March 28, 2001, Temporary Cease and Desist Order. Thus, the OCC alleges that Hamilton violated the terms of the 2000 consent decree by its continued failure to maintain complete and accurate books and records.

**11.** Of course, this is not to say that the enforceability of a sanction for non-compliance will not be subject to question where the terms of the cease and desist order are clearly ambiguous.

emergency injunctive relief. *See Holiday Tours*, 559 F.2d at 843. Hamilton contends that it will suffer irreparable harm in the form of a "crushing administrative burden on the bank" which will "require it to curtail or shut down large portions of its lending and credit practices." Pl. Mem. at 19. The bank further argues that compliance with the terms of the Temporary Cease and Desist Order is "impossible, or commercially and competitively impracticable." *Id.* at 7. The impact of these conditions, avers Hamilton, will result in the loss of new and existing business, as well as in "permanent and irreparable harm to the bank, its customers, correspondents, shareholders and depositors." Pl. Mem. at 7, 25.

In a general sense, the OCC rebuts Plaintiff's assertions of irreparable harm by pointing to the terms of Article XI of the Temporary Cease and Desist Order. As mentioned above, Article XI provides a mechanism through which the Bank may request relief from any genuine harm by merely contacting the OCC. The Court again notes that Hamilton has already taken action pursuant to Article XI with regard to certain provisions of the Temporary Cease and Desist Order, and within two days, received some, albeit limited, relief in the form of a clarification or narrowing of the terms of the Order. *See* Pl. Mem., Exs. 8 & 9, Def. Supp., Ex. 2. Significantly, in its analysis of an allegation of irreparable harm in *CityFed*, the Court of Appeals seized upon a similar clause in the temporary cease and desist order issued in that case, and indicated that the existence of the clause permitting a request for relief undercuts the contention that irreparable harm is "truly threatened." *CityFed*, 58 F.3d at 746 ("As the

district court pointed out, CityFed is not truly threatened with bankruptcy. [The agency's] temporary cease and desist order ... permits the company to request 'hardship' relief from the requirements of the order ...."). There are clearly provisions in the Temporary Cease and Desist Order from which Hamilton has not yet sought relief from the OCC. Having failed to do so, this Court is reluctant to characterize the bank's allegations of irreparable injury as truly impending.[12]

A significant portion of Hamilton's assertion of injury from the Temporary Cease and Desist Order focuses upon the numerous requirements set forth in Article I as prerequisites to the issuance of a new loan over one million dollars. *Id.* at 25. In addition, Plaintiff asserts that the Article III prohibitions which restrict Hamilton's ability to place funds on deposit with other lending institutions will hinder Hamilton's ordinary, legitimate business. *Id.* at 25. Lastly, Plaintiff contends that Article IV's "blacklist" will irreparably harm its business with those entities and numerous other related entities. *Id.* at 25–26. In its initial memorandum, Plaintiff offered few, if any, specifics to support the above assertions of injury. However, in its Reply, Hamilton avers that, in the days since the Temporary Cease and Desist Order was imposed, it has been forced to reject creditworthy customers from receiving financing, has suffered damage to its reputation, and risks defaulting on legal obligations under existing credit agreements. Pl. Reply at 6–7.

■ Focusing first on Article I, Plaintiff argues that the requirements of Article I have resulted in the rejection of qualified customers due to the fact that the requirements imposed therein exceed those im-

---

12. Furthermore, the OCC has given every indication that it is open to further negotiation and softening of the terms of the Order pro-vided Hamilton can display that such softening will not hinder the bank's movement toward compliance and stability.

posed upon any other bank. *Id.* The OCC counters with evidence that many of the requirements imposed in Article I of the Temporary Cease and Desist Order are the same requirements enumerated in the *Comptroller's Handbook on Loan Portfolio Management* (April 1998 ed.) which sets forth underwriting standards for all loans. *See* Def. Surreply, Ex. 1 at 21. The OCC argues that, in light of the *Handbook*, the only resulting injury Hamilton might suffer as a result of the Article I requirements is a loss of other business to other noncomplying banks. *Id.* at 2. This injury, contends the OCC, is not only speculative, but is not one from which Hamilton is entitled to Court protection. The Court agrees.

The twenty-seven items of information enumerated in Article I appear to overlap with many of the standard items of information required before any bank can issue a loan. *Compare* C & D at 2–6, *with* Def. Surreply, Ex. 1. Admittedly, the Temporary Cease and Desist Order removes much of the discretion bank officials might otherwise have had to determine which information is not necessary for a particular loan and requires some additional information not specified in the *Handbook.* Nonetheless, this loss of discretion, combined with the requirement that the bank obtain some additional pieces of information, does not appear to be unreasonably burdensome in light of the OCC's well substantiated concerns.

It is particularly significant, in consideration of the provisions in Article I, that the OCC has repeatedly cited problems with the completeness and the accuracy of Hamilton's books and records. The alleged incompleteness of the bank's books and records renders it impossible for the regulatory agency to determine the status of the bank's assets and earnings. This concern is worthy of considerable deference in light of the fact that the OCC is not acting as merely a regulator in this instance, but is, in some regards, an interested party. The OCC's monitoring of the bank's activities are integrally tied to the role of the government as insurer of the bank's accounts. Thus, if Hamilton is permitted to continue its allegedly unsafe and unsound practice of maintaining incomplete books and records, the OCC's interest in preserving the safety and soundness of the bank and preventing a loss to the Federal Deposit Insurance Fund will be harmed. Accordingly, to the extent that Article I imposes an administrative burden on the bank, the imposition of the burden appears not only to be reasonable and justified, but in some regards, necessary to the ability of the OCC to perform its statutory function.

Moreover, as the government aptly points out, in order to relieve some of the burden imposed by Article I, the bank can raise, and has raised, some of its concerns regarding the Article I requirements pursuant to the process specified in Article XI of the Temporary Order. *See* Pl. Mem., Exs. 8 & 9. The OCC has already indicated that it will consider specific exceptions to the Article I requirements on a case by case basis. Pl. Mem., Ex. 9. Further, despite its assertions to the contrary, Hamilton has failed to point to any specific instances of actual injury resulting from Article I's informational requirements.[13] Given these facts, the Court con-

---

13. Hamilton's reply attests that its sudden change in policy has "angered" at least two customers. Pl. Reply, Justo Decl. ¶¶ 11, 12. Despite this assertion, the Court notes that there is no evidence that the bank has actually lost any customers or business as a result of the Order. *See generally, id.* Thus, there is little, if any, evidence of truly irreparable harm. Likewise, Hamilton claims that it has suffered damage to its reputation as a result

cludes that Article I's requirements impose only a limited degree of additional burden upon the bank, and certainly do not appear to cause any clearly identifiable irreparable harm.

Despite its repeated complaints about Article III, Hamilton fails to identify any specific injury which it will suffer as a result of the requirements set forth in Article III of the Temporary Cease and Desist Order. The bank states only that the requirements set forth therein will "negatively affect Hamilton's liquidity." Pl. Mem., Ex. 1 ¶ 24. This broad assertion is not sufficient to justify a finding that Hamilton will suffer irreparable harm as a result of the provisions in Article III of the Temporary Order. Furthermore, the OCC has clarified that Article III does not, in fact, prohibit Hamilton from dealing with offshore banks in good standing. Def. Opp. at 12. Rather, Article III restricts the bank from placing funds on deposit with a bank that is not licensed to operate as a bank in the jurisdiction where it is located. *Id.* This prohibition is necessary, argues the OCC, however damaging to business it may be, because the practice of placing funds in unlicensed institutions is inherently threatening to the bank's assets. In reply, Plaintiff offers no justification for why it is necessary to its business to place funds with unlicensed institutions, nor can the Court conceive of any legiti-

mate justification. Accordingly, it does not appear that Plaintiff can show that the provisions in Article III of the Temporary Cease and Desist will cause irreparable injury.

Hamilton's third alleged source of irreparable harm is Article IV of the Temporary Cease and Desist Order, which effectively bars Hamilton from conducting business with a number of third parties, as well as the sources of funds for these third parties. Hamilton considers this restriction to be "unworkable." [14] Pl. Mem., Ex. 1 at ¶ 24.

■ The OCC's justification for the blacklist is plainly apparent from the allegations in the documents underlying the Temporary Cease and Desist Order, including the Notice of Charges, the Memorandum of Decision to Issue the Temporary Cease and Desist Order, and the ROE—these individuals and entities are allegedly engaged in suspicious and unsound practices themselves. Although Article IV will likely cause irreparable harm to the bank's business in that the bank can no longer engage in transactions with certain individuals or entities, the potential damage to Hamilton's assets as a result of the bank's ongoing relationship with entities allegedly engaged in suspicious activities is far more harmful to the bank.

---

of Article I. Pl. Reply at 6. However, the court finds this contention to be largely without merit. The change in Hamilton's practices is merely one from alleged non-compliance with safe and sound banking practices to one of compliance. Thus, if this change were to harm reputation, it would appear that it would only harm Hamilton's reputation with those customers and prospective customers who wish to circumvent sound banking practices. By inference, these customers pose risks to the assets and earnings of their bank, and as a result, the loss of such customers would appear to inflict little, if any injury upon the bank.

14. Since the issuance of the Temporary Cease and Desist Order, the OCC has clarified the terms of Article IV to indicate that it is to be read more narrowly than it might have appeared, and has further indicated that the bank is only required to comply with the terms of Article IV to the extent the Bank knows or has reason to know that a "blacklisted" party is providing funds to another party. *See* Pl. Mem., Ex. 9 at 4. These clarifications would appear to make compliance with Article IV somewhat more "workable."

Thus, when the scales are properly weighted, the balance tips in favor of Article IV, which ensures that the bank will suffer the least amount of potentially irreparable damage.[15]

Having considered all of Hamilton's enumerations of irreparable damage, the Court concludes that the "bark" of the Temporary Cease and Desist Order appears to be worse than its "bite." That is, upon examination, the terms of the Order reveal themselves to be quite carefully tailored to address the deficiencies and violations alleged in the underlying Notice of Charges. While the terms of the Order may exceed Hamilton's existing policy, their additional burden does little more than ensure that the Bank complies with existing statute and regulation. Accordingly, any harm which is caused by these additional burdens is not harm from which the Bank is entitled to relief.

## C. *Effect on Other Interested Parties*

Because Hamilton disagrees with the OCC's assessment of its financial stability, arguing that it is a "fully liquid, well-capitalized" bank, Hamilton asserts that the additional burden of the terms of the Temporary Cease and Desist Order will injure the bank's employees, customers, depositors and shareholders, rather than protect them. Pl. Mem. at 32. The OCC contests this assertion and insists that these parties, as well as the OCC itself, would be harmed by an order from the Court setting aside the Temporary Cease and Desist Order. Def. Opp. at 21. The OCC reasons that any suspension of its Temporary Cease and Desist Order would interfere and hinder the ability of the OCC to supervise the bank. Absent this close supervision, argues the OCC, the effects of the OCC's corrective measures may be reversed, and the bank may plunge further into instability and uncertainty.

At this preliminary juncture, the divergent positions of the two parties cannot be characterized as anything other than a factual dispute. Hamilton offers the affidavit of bank President J. Carlos Bernace in support of its view of the bank's financial status. Pl. Mem., Ex. 1 at ¶¶ 7, 10. President Bernace insists that the bank is "well capitalized" and is "in sound financial condition." *Id.* Even accepting the view of President Bernace, however, Plaintiff's contention in this regard addresses only one of the two underlying justifications for the Temporary Cease and Desist. Specifically, Plaintiff's statement regarding its financial stability does not address the OCC's contention that Plaintiff's financial books and records are so incomplete that the OCC examiners are unable to determine with any degree of certainty the bank's true financial condition. The alleged state of disarray alone justifies imposition of a temporary cease and desist order. 12 U.S.C. § 1818(c)(3). Therefore, assuming arguendo that the Court accepted Plaintiff's contention that its financial

---

**15.** The Court notes further that the OCC clarified during a hearing before the Court that the Article IV prohibitions apply only to *new* transactions with these "blacklisted" entities, and does not bar completion of already existing obligations with these entities and individuals.

As a related issue, Hamilton argues that compliance with the Temporary Cease and Desist Order risks exposure to liability for failure to fulfill existing contracts. However, the OCC recently clarified via letter to Hamilton and in open court that the Temporary Cease and Desist Order was not intended, nor should it be interpreted, to interfere with already existing contractual obligations between the bank and its customers, including the customers on the so-called "blacklist." In light of this clarification, there appear to be little risk, at this point, that compliance with the terms of the Temporary Cease and Desist Order will pose a risk of litigation to the bank. To say otherwise would be purely speculative.

condition was not as dire as the OCC believes, the imposition of a temporary cease and desist order would still be justified by the need to ensure that Hamilton maintains complete and accurate records. Accordingly, the interests of the OCC and Hamilton's investors, depositors, and customers are served by imposition of the Temporary Cease and Desist Order which will ensure compliance with the requirement that the bank maintain accurate documentation of its transactions. In this regard, the concerns of interested third parties appear to outweigh the administrative burdens imposed by the Temporary Cease and Desist Order.

*D. Public Interest*

In many cases, the analysis of the public's interest mirrors the analysis of the interests of other related parties. This fact is particularly true in this instance, where the OCC's primary justification for its actions rests on the assertion that it is endeavoring to protect members of the public as well as the funds in the public fisc from the harm they will suffer if Hamilton's allegedly unsound practices cause the bank to fail. The OCC's allegations of unsafe and unsound practices are extremely well supported and cannot be taken lightly by this Court. The OCC is given the authority to regulate, presumably in the public's interest, and the specific authority to issue temporary cease and desist orders when the agency deems them to be necessary. To hinder the OCC's regulatory ability by suspending that Temporary Order, would thwart the public's interest in ensuring that Hamilton remains solvent. Accordingly, it appears that the public's interest weighs in favor of denying Hamilton's petition for a TRO/PI.

### III. Conclusion

Based on the foregoing, the Court concludes that neither a temporary restraining order, nor a preliminary injunction is warranted in this case. Plaintiff has failed to convince the Court that the actions of the OCC will cause the bank irreparable harm. In addition, it appears, from this preliminary examination of the merits of the case, that the OCC is likely to prevail. These two conclusions are further compounded by the determination that the interests of related third parties and the public's interest weigh against granting Plaintiff's motion for emergency injunctive relief. As a result, the Court shall deny Plaintiff's motion for a TRO/PI. An appropriate Order accompanies this Memorandum Opinion.

### ORDER

This case comes before the Court on Plaintiff Hamilton Bank's motion for emergency injunctive relief from the Temporary Cease and Desist Order issued by Defendant OCC on March 28, 2001. For the reasons set forth in the accompanying Memorandum Opinion, it is, this 13 day of April, 2001, hereby

**ORDERED** that Plaintiff's motion for a Temporary Restraining Order and/or Preliminary Injunction is DENIED.

**SO ORDERED.**